APPEAL OF C. U. CONNELLEE.

Docket No. 3363. Decided July 24, 1926.

1. On the evidence, *held*, that the taxpayer is entitled to a deductible loss on account of the abandonment of plans to build a hotel in 1919.

2. The March 1, 1913, value of real estate determined.

3. The amount of deductible loss sustained on account of abandoning plans to build a railroad is based on the cost of the stock of the railroad.

*George Roscoe Davis*, Esq., and *Jos. Bailey*, Esq., for the petitioner.

*M. N. Fisher*, Esq., for the Commissioner.

Before GRAUPNER[1] and TRAMMELL.

This is an appeal from the determination of a deficiency in income tax for 1919 amounting to $55,589.97. The deficiency arises from the disallowance by the Commissioner, as a deduction from gross income, of an amount claimed as a loss on business ventures in 1919 and the increase of profits returned by the taxpayer from the sale of certain lots.

FINDINGS OF FACT.

The taxpayer is a resident of Eastland, Tex. In June, 1919, he began the construction of a seven-story hotel at Eastland, which, according to estimates, would cost, when completed, approximately $268,000. The work proceeded until the latter part of October, 1919. Due to a change in business conditions in that vicinity, the taxpayer deemed it advisable to abandon the construction of the hotel, and about November 1, 1919, the project was wholly abandoned. During the year 1919, $37,335.73 was paid out on account of work performed and material furnished in connection with the work, and a liability to the extent of $7,922.17 was incurred during that year in connection with the building, which amount was not actually paid out until after the end of the year. When the work was abandoned the foundation was nearly completed. The citizens of the town desired to have the hotel completed and a citizens' committee was organized in the spring of 1920 to interview the taxpayer. He informed the committee that if arrangements could be made to complete the building he would donate what he had invested in the enterprise up to that time. The committee, in order to get information as to the cost of a three or four-story building, requested the taxpayer to have his architect, who had prepared the plans and supervised the work, furnish estimates as to the probable cost. In pursuance of such request, taxpayer sent, on April 1, 1920, the following letter to the architect:

I shall take up with you in a very short time the matter of the construction of my hotel and perhaps you will want to make another visit here instead of my going to Chicago.

On April 20th he sent the following telegram to the same party:

Am ready to finish construction of Connellee hotel. Can you meet me here Monday April twenty-sixth. Answer.

C. U. CONNELLEE.

The taxpayer in sending the communication did so for the citizens' committee and was acting for them. He did not himself have any intention of resuming the building operations after they were aban-

---

[1] This decision was prepared during Mr. Graupner's term of office.

doned in 1919. The lot was no more valuable as the result of the excavation and foundation work than it was before, as the foundation was unsuited for any other kind of building, and the taxpayer reached the conclusion that any more money invested would have been a loss. On account of the developments in the oil industry, and the discovery of oil in other territory, there appeared no need for the hotel in Eastland.

During the month of December, 1918, the taxpayer and others organized a corporation known as the Eastland, Wichita Falls & Gulf Railroad Co., which was to build and operate a steam standard gauge railroad from the towns of Mangum, Eastland and Breckenridge to New Castle in Young County. The purpose of the construction of this railroad was to improve transportation facilities to meet the demands of the newly developed oil fields in and about Eastland. The taxpayer subscribed for $10,000 par value of capital stock in said railroad corporation, and during the year 1919 paid for his subscription and also took over one-half of the stock subscriptions of D. S. Walker and Fred Frost, paying in to the railroad corporation an additional $16,500. He also incurred a liability of $1,794.26 for sundry items for the railroad corporation which was not paid until 1920. On March 4, 1920, he paid $5,000 additional cash for which he had obligated himself during the year 1919. In addition to the cash paid out, he obligated himself to turn over to the railroad corporation, and did turn over during the year 1919, 29 acres of land to be used for right of way, depot and terminal purposes, which had a value at that time of $29,000. All of the above payments were made as the cost of the acquisition of stock of the railroad company.

During the latter part of 1919 large railroad companies extended branch lines into the field which it was originally contemplated would be served by the Eastland, Wichita Falls & Gulf Railroad Co., and on account of such ventures by other railroad companies the Eastland, Wichita Falls & Gulf Railroad Co. was unable to raise sufficient funds to complete the construction of the railroad, and the officers of said railroad company decided to abandon the project. In view of certain obligations which the corporation had assumed, however, they were unable to actually abandon the work and about the month of October, 1919, entered into an oral agreement with John Ringling to complete the project, which oral agreement was during the month of December, 1919, reduced to writing, a copy of which is as follows:

The State of Texas,
      County of Eastland.

Whereas this contract and agreement between C. U. Connellee, Cyrus B. Frost, Earl Conner, Tom Harrell, and H. P. Brelsford, individually and as

directors of the Eastland, Wichita Falls & Gulf Railroad, a corporation, incorporated under the laws of Texas, with its principal office and place of business in the City of Eastland, in Eastland County, Texas, hereinafter called party of the first part, and John Ringling of the city of New York, hereinafter called party of the second part:

1. Parties of the First Part bind and obligate themselves, jointly and severally, to procure and deliver to Second Party, free of all lien, claim or incumbrance, the majority and controlling stock of said railroad corporation within ten (10) days from the date hereof, and the entire capital stock of said railway company within twelve (12) months from the date hereof, provided only that in the event said parties of the First Part are unable to procure any minority stock in said railroad company at the par value thereof, that they may satisfy this obligation by paying to said John Ringling the par value of said stock.

2. Parties of the First Part further bind and obligate themselves to procure by proper action of the directors and stockholders of said railroad company, a valid and legal conveyance of all the property rights and franchises of the Eastland, Wichita Falls & Gulf Railway Company, including specifically the charter rights-of-way, Terminal grounds and any and all real estate owned by said railway company, or by any trustee holding same for said railway company, together with all rights of said railway company in any and all crossing contracts or interchange contracts with the Missouri, Kansas & Texas Railway Company of Texas, and the Texas and Pacific Railway Company, and Receivers and Federal Managers in present control of said roads.

It is understood that Parties of the First Part are at their own proper charge and expense to deliver to said Party of the Second Part good and sufficient deed to all the right of way of said railroad company from a connection with the Missouri, Kansas & Texas Railway Company of Texas in the town of Mangum, Eastland County, Texas, to the townsite of Wayland, including said townsite as surveyed and platted by C. H. Chamberlain, Chief Engineer, in the County of Stephens, including a completed grade from said town of Mangum, Eastland County, Texas, to and including said town of Wayland, Stephens County Texas, free of any and all liens and incumbrances of whatever character.

Parties of the First Part further bind and obligate themselves at their own proper charge and expense to procure additional right of way from the track extending from the M. K. & T. Railway Company of Texas to the grade of the Eastland, Wichita Falls & Gulf Railway Company at Mangum, Texas, at such points of intersection as may be required by the Chief Engineer of said Railway Company.

Parties of the First Part are also to pay for the townsite of Wayland, in Stephens County, Texas, and all expenses incident to surveying, platting and grading of same, and they are to be reimbursed for such expense out of the first sales made by Party of the Second Part, or his assigns, of lots or property in said townsite of Wayland.

Parties of the First Part further bind and obligate themselves to procure the purchase of One Hundred Fifty Thousand ($150,000) Dollars worth of six per cent (6%) First Mortgage Bonds, secured by the properties and franchises of said line of railroad, which are to be the first lien upon said property and are to be issued under the authority of the Railroad Commission of Texas and the amount paid to the credit of Party of the Second Part not later than ninety (90) days from the date hereof, the maturity of said bonds to be mutually agreed upon by Parties of the First and Second Parts.

3. Party of the Second Part on his part, binds and obligates himself to immediately equip said roadbed from the town of Mangum, Eastland County, Texas,

to the town of Wayland, Stephens County, Texas, aforesaid with the necessary steel, ties and bridging material, and to furnish rolling stock and any other equipment or material required for the proper and reasonable operation of a standard gauge line of railway from the town of Mangum in Eastland County, Texas, to the town of Wayland in Stephens County, Texas, aforesaid. The said road to be completed and equipped and in operation within ninety days from the date hereof, unless prevented by unavoidable accidents or delays or any causes for which Party of the Second Part is not responsible and Party of the Second Part further binds and obligates himself that he will continue the operation of said road for a period of five (5) years from date hereof, and that operation shall not be suspended until the operations shall prove to be unprofitable and operations may be suspended only upon the order and consent of the Railroad Commission of Texas. It is further understood and agreed as a part of the consideration of this contract that the Party of the Second Part and his assigns, bind and obligate himself and themselves in any event not to sell said railroad to any parallel line of railway.

An additional consideration for this contract is that Party of the Second Part binds and obligates himself or his assigns to extend said line of railway from the town of Wayland in Stephens County, Texas, to such other points in Stephens County as may be necessary to intersect any line of railroad built from the main line of the T. & P. Railway Company to Breckenridge, Texas, or north boundary line of the south half of Stephens County, Texas, but that the matter of any other extension in any direction shall be at the option of Party of the Second Part.

It is further understood and agreed that in the event Party of the Second Part or his assigns fail to comply with the terms of this contract within the period mentioned that they shall reconvey to the present directors of said railroad as Trustees all the property rights, interests and franchises contracted by Party of the First Part to be transferred and conveyed to Party of the Second Part, and that said directors, as trustees, aforesaid, shall have the right to purchase the rolling stock, steel and improvements made on said property by Party of the Second Part, or his assigns, at the fair market value of same to be determined by the Railroad Commissioner of Texas, in the event that Parties of the First Part and Party of the Second Part cannot agree as to its value.

It is further understood that Party of the Second Part shall proceed immediately in good faith to the performance of this contract but that he shall not be held liable for any unavoidable accidents, failure to receive material, strikes, or any other causes which he is unable to avoid by the exercise of ordinary care and reasonable diligence.

Party of the Second Part and his assigns bind and obligate themselves and himself to construct and maintain the general offices and headquarters of said railroad company in the City of Eastland, Eastland County, Texas.

Immediately after making the oral agreement to transfer the property to Ringling, all the railroad property, right of way, terminal and depot grounds were turned over to Ringling's representatives, who immediately proceeded to complete the railroad according to the terms of the agreement. The transfer to Ringling amounted to a sale or other disposition of the stock, and the consideration received was the relieving of the taxpayer and others of the additional burdens and obligations involved in their contract to complete the railroad.

The cash and property which the taxpayer invested in the stock of the Eastland, Wichita Falls & Gulf Railroad was a complete loss to him. The loss resulting from this transaction in 1919 was $62,294.26. The taxpayer kept his books and returned his income on the cash receipts and disbursements basis.

During the taxable year 1919, the taxpayer sold certain pieces of real estate which he acquired in 1904 at $350, upon which he reported a taxable profit. The cost was less than March 1, 1913, value and he computed his profit on the March 1, 1913, value. The real estate sold by taxpayer during the year 1919 was not subdivided into lots on March 1, 1913, but was divided into city blocks. Such subdivision was located in the residential district and was known as the Connellee Place Addition. In 1917 or the early part of 1918 he subdivided this property and sold lots from it during the year 1919 to the following named persons at the following prices. The following schedule also gives the March 1, 1913, value as claimed by taxpayer and the March 1, 1913, value allowed by the Commissioner.

| Name of purchaser. | Sale price per revenue agent's report. | Value as of Mar. 1, 1913, per revenue agent's report. | Sale price per amended return filed by petitioner. | Value as of Mar. 1, 1913, per amended return filed by the petitioner |
|---|---|---|---|---|
| Stewart | $400.00 | $107.07 | $400.00 | $300.00 |
| Fielder | 400.00 | 117.77 | 400.00 | 300.00 |
| Klapper | 700.00 | 214.14 | 700.00 | 600.00 |
| Nance | 350.00 | 107.07 | 350.00 | 300.00 |
| Orth | 1,000.00 | 214.14 | 1,000.00 | 600.00 |
| Mathews | 500.00 | 107.07 | 500.00 | 300.00 |
| Smith | 600.00 | 117.77 | 600.00 | 350.00 |
| Gillespie | 1,450.00 | 438.98 | 1,450.00 | 1,400.00 |
| Gordon | 1,300.00 | 224.84 | 1,300.00 | 700.00 |
| Funderburk | 1,000.00 | 117.77 | 1,000.00 | 400.00 |
| Texas Co | 2,000.00 | 224.84 | 2,000.00 | 800.00 |
| McMullen | 750.00 | 224.84 | 750.00 | 600.00 |
| Mayfield Con. Co | 2,550.00 | 438.98 | 2,550.00 | 1,400.00 |
| McRae | 1,000.00 | 117.77 | 1,000.00 | 350.00 |
| Lewis & Owens | 3,000.00 | 653.12 | 3,000.00 | 1,800.00 |
| Carroll and Parker | 8,000.00 | 4,000.00 | 8,000.00 | 3,000.00 |
| McDaniel | 750.00 | 100.00 | 750.00 | 500.00 |
| Voliva | 600.00 | 400.00 | 500.00 | 500.00 |
| Dutch Yancy | 250.00 | 200.00 | 250.00 | 250.00 |
| Charles Yancy | 300.00 | 200.00 | 300.00 | 250.00 |
| Schaeffer | 300.00 | 200.00 | 300.00 | 250.00 |
| Logan | 300.00 | 200.00 | 300.00 | 250.00 |
| Lauders | 300.00 | 200.00 | 300.00 | 250.00 |
| Faucett and Winn | 150.00 | 75.00 | 150.00 | 100.00 |
| Atlas Sup. Co | 1,000.00 | 100.00 | 1,000.00 | 500.00 |
| Yancy | 400.00 | 95.00 | 400.00 | 250.00 |
| Sayles | 500.00 | 107.07 | 500.00 | 250.00 |
| Cartwright | 500.00 | 115.00 | 500.00 | 250.00 |
| Williams | 360.00 | 100.00 | 360.00 | 300.00 |
| Eisenuth | 450.00 | 400.00 | 450.00 | 400.00 |
| Waggoner | 1,350.00 | 160.61 | 1,350.00 | 450.00 |
| Funderbunk | 450.00 | 53.53 | 450.00 | 250.00 |
| Coldiron | 600.00 | 400.00 | 600.00 | 400.00 |
| Oil Belt Power Co | 1,000.00 | 400.00 | 1,000.00 | 600.00 |
| Pritchard | 350.00 | 107.07 | 350.00 | 250.00 |
| Morton | 750.00 | 224.84 | 750.00 | 500.00 |
| Gillespie | 350.00 | 107.07 | 350.00 | 200.00 |
| Klapper | 400.00 | 117.77 | 400.00 | 250.00 |
| Andrews | 350.00 | 107.07 | 350.00 | 200.00 |
| Murphy | 350.00 | 107.07 | 350.00 | 200.00 |
| Tanner | 750.00 | 224.84 | 750.00 | 450.00 |
| McElreath | 700.00 | 214.14 | 750.00 | 400.00 |
| Smith | 800.00 | 214.14 | 800.00 | 450.00 |
| | 39,360.00 | 12,356.39 | 39,310.00 | 22,100.00 |

The fair market value on March 1, 1913, of the lots sold by taxpayer during the year 1919 was $22,100. The selling price was $39,310.

### OPINION.

TRAMMELL: The issues involved in this appeal are: (a) The amount of loss, if any, sustained in the year 1919 on account of taxpayer's investment in the hotel project which was begun during that year and abandoned the same year. (b) The amount of loss sustained by the taxpayer on account of his investment in the stock of the Eastland, Wichita Falls & Gulf Railroad Co. (c) The amount of gain realized by the taxpayer on the sale of lots in 1919, the question in dispute being the March 1, 1913, value of the lots.

In June, 1919, the taxpayer began the construction of a seven-story hotel building at Eastland, Tex. By the latter part of October of the same year the basement was almost completed when the taxpayer caused the work to be discontinued by the contractor. No work was done on the building after November 1, 1919. The taxpayer claims that he definitely abandoned the plan for the completion of the hotel in October, 1919, due to a change in business conditions in that vicinity, and sustained a loss on the project of $45,257.90. Expenses to the extent of $7,922.17 were incurred in connection with this project which were not paid until some time after the work was abandoned. The Commissioner contends that the hotel project was not abandoned, if at all, until 1920, as the taxpayer, on April 1, 1920, sent messages, which are set out in the findings of fact, to the architect who had prepared the plans and specifications and who was to supervise the construction of the building, and that the messages indicated that the taxpayer had not abandoned the project but had in mind continuing it. We are of the opinion from the evidence that the project was actually abandoned by the taxpayer in 1919.

The further question then arises whether, since the foundation of the building became a part of the realty, the taxpayer is entitled to deduct any loss under the decision of this Board in *Appeal of A. J. Schwarzler Co.*, 3 B. T. A. 535. We are of the opinion that the decision in that appeal has no application to the facts presented in this. In that case it appeared that the taxpayer owned certain real estate, the cost of which he sought to deduct as a loss on the ground that it was without value and had been abandoned. It appeared that title was still in the taxpayer and the loss was not allowed. While the foundation of the proposed hotel involved in this appeal became, technically, a part of the real estate, the taxpayer does not claim a loss based on the abandonment of real estate, but upon the abandonment of a business venture. The project

was abandoned in 1919, it was never renewed, and no additional value to the real estate resulted.

In our opinion there is a distinct and very real difference between an attempt to abandon real estate or beneficial improvements placed thereon and the abandonment of an independent business undertaking in which an addition to real estate has been made as a part of that undertaking, but has never reached the stage where it increases the value of the real property. Amounts invested in a business enterprise are allowable as deductions for losses in the year in which the enterprise is finally wound up or abandoned, and it seems that under the circumstances of this appeal the taxpayer should be allowed to deduct in 1919 the amount expended in connection with the hotel venture.

The second issue involved in this appeal is the amount of the loss sustained by the taxpayer on account of his participation in the railroad project referred to in the findings of fact. In 1918 the taxpayer and several others undertook to construct a railroad to improve transportation facilities to meet the demands of the newly developed oil fields in and about Eastland. The taxpayer subscribed for a large amount of capital stock in said railroad corporation and turned over to it during the year 1919 land for right of way, depot and terminal purposes. The taxpayer was to receive stock in said railroad corporation for the cash subscribed and the value of the land. The amount of money subscribed was all paid over to the railroad company during the year 1919, except the sum of $6,794.26, which was not paid by the taxpayer until 1920, although a liability to pay such amount was incurred during 1919. In the latter part of 1919, it became apparent, by reason of competing interests, that the taxpayer and his associates would be unable to complete the undertaking successfully. They then decided to discontinue the project, but owing to certain obligations which the corporation had assumed they were unable to abandon the work. They succeeded in interesting Ringling in the undertaking and entered into an oral contract with him during the latter part of October, 1919, to complete the project, which agreement was later reduced to writing and is set out in the findings. The taxpayer was not reimbursed for the amount of money expended on the railroad project or for the land which was used for right of way, depot and terminal purposes. The transaction taken as a whole amounted to a purchase and sale of stock. The consideration received was the release from further performance of the contract, and did not return to the taxpayer the cost of the stock, which became a total loss to him. The cost of the stock was the cash paid in 1919 and 1920 and the value of the land at the time paid in, which value we find to be $29,000.

The other issue involved in this appeal is the gain realized by taxpayer on account of the sale of lots during 1919. The taxpayer had acquired certain lots prior to March 1, 1913, which included a subdivision in the residential district of Eastland, known as the Connellee Place Addition. The cost of this land was less than the March 1, 1913, value. There is no dispute about the amount received by the taxpayer for the lots sold during the year 1919 as set out in the findings. The question involved is the fair market value of the lots on March 1, 1913.

The taxpayer has been engaged in the real estate business in Eastland for over forty years and is recognized as authority on real estate values. According to his testimony, the fair market value of the lots in question on March 1, 1913, was $22,100. This value is based on his experience in buying and selling lots and other real estate in that vicinity. The lots in question were not sold or offered for sale in 1913, but other lots in the vicinity were sold during that year at prices which support the values claimed by the taxpayer on the lots here involved. This value is supported by the testimony of several other witnesses who had lived in that town for a number of years and who were familiar with the location of the property and the values in 1913.

The Commissioner has placed a value as of March 1, 1913, on the lots sold at $12,356.39. Two witnesses testified on behalf of the Commissioner as to the acreage value on March 1, 1913, of the land here involved. One of these witnesses testified that the land in question was, on March 1, 1913, worth $40 per acre, and the other testified that it was worth $400 per acre on the same date. This evidence is so varying and indefinite as to be of little value in arriving at a fair market value on March 1, 1913. The lots in question were sold by the taxpayer at $39,360. The evidence submitted is sufficient to support the claim made by the taxpayer that the fair market value on March 1, 1913, was $22,100.

> *Order of redetermination will be entered on 15 days' notice, under Rule 50.*

MARQUETTE and STERNHAGEN dissent.